The Honorable John C. Coughenour

1

2

3

4

5

6

7            IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
8                      AT SEATTLE

9   BAROVIC v. BALLMER, ET AL.          | Lead Case No.: 2:14-cv-00540-JCC

10                                        (Consolidated with Case No. 2:14-cv-
                                          00586-JCC)
11  This Document Relates To:

12                                        VERIFIED CONSOLIDATED
                                          SHAREHOLDER DERIVATIVE
13                                        COMPLAINT

        ALL ACTIONS                       **JURY DEMAND**
14

15

16          **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

17          1.      Plaintiff Kim Barovic ("Barovic") and Plaintiff Stephen DiPhilipo ("DiPhilipo")

18  (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this

19  Verified Consolidated Shareholder Derivative Complaint (the "Complaint") for the benefit of

20  nominal defendant Microsoft Corporation ("Microsoft" or the "Company") against certain

21  current and/or former members of its Board of Directors (the "Board") and executive officers,

22  seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2011 to

23  the present (the "Relevant Period").

24  //

25

26

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 1
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

## NATURE OF THE ACTION

2.      According to its public filings, Microsoft is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

3.      Beginning around 2007, the European Union ("EU") began probing the Company regarding antitrust violations with respect to the inclusion of Internet Explorer (and only Internet Explorer) with the Windows Operating System ("Windows").   In December 2009, EU regulators dropped an antitrust case against Microsoft after the defendants caused the Company to agree to offer consumers a choice of rival Web browsers with Windows (the "Settlement").  The Settlement was a five-year deal, whereby European Windows users would be given a choice of 11 competing web browsers, including those made by Apple, Google and Mozilla.  By stipulating to the Settlement under the defendants' direction, Microsoft avoided paying a fine to EU officials.  Critically, pursuant to the terms of the Settlement, Microsoft was directly responsible for monitoring its own compliance with the Settlement over the next five years.

4.      Beginning in February 2011, under the defendants' direction and on their watch, the Company blatantly and continuously violated the terms of the Settlement.  At that time, in direct violation of the Settlement, the defendants caused Microsoft to eliminate the choice screen from *at least 15 million* installations of Windows 7 in Europe, making Internet Explorer the only Web browser available on these installations.

5.      In the summer of 2012, although Microsoft was responsible for monitoring its compliance with the Settlement, the EU antitrust chief, Joaquín Almunia ("Almunia") of the European Commission, warned the defendants that on some occasions Microsoft software was not providing users the full access to competing Web browsers, as was stipulated in the

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 2
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Settlement.  The defendants "apologized" to Almunia, calling it a "technical problem."  Yet despite the apology, the defendants did nothing to halt the illicit scheme.

6.     On March 6, 2013, it was announced that European regulators had fined Microsoft an extraordinary *€561 million, or approximately $732.2 million*, for violating the Settlement.  Notably, this was *the first time in history* that the EU had punished a company for violating the terms of an antitrust settlement.  Despite the enormous and unprecedented fine at issue, the defendants issued an extremely short statement in response to the disastrous situation, accepting responsibility but maintaining that the violation of the Settlement was purportedly nothing more than a "technical error."  Moreover, the defendants offered no explanation as to how the Settlement could have been violated, even though Microsoft itself was responsible for monitoring its own compliance with the Settlement.

7.     As a result of their actions, the defendants have caused the Company to be damaged to the extent of at least *$732.2 million*.

8.     As a result of the above, on March 22, 2013, Barovic issued a pre-suit demand pursuant to Washington law (the "Barovic Demand") on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company.  A true and correct copy of the Barovic Demand is attached hereto at Exhibit A.

9.     Over ten months later, on January 28, 2014, Barovic's counsel received a letter from attorney Susan S. Muck ("Muck") of the law firm Fenwick & West LLP ("Fenwick"), informing Plaintiff's counsel that the Demand was being refused in its entirety.  This correspondence of January 28, 2014 shall be referred to as the "Barovic Refusal."  The Barovic Refusal informed Barovic's counsel that Fenwick was counsel to a purported Board subcommittee (the "Demand Review Committee" or  "DRC"), consisting of two directors

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 3
2:14-cv-00540-JCC
2:14-cv-00586-JCC

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

(defendants Stephen Luczo and Dina Dublin, both further defined herein), who were purportedly appointed to investigate the allegations in the Demand.  A true and correct copy of the Barovic Refusal is attached hereto at Exhibit B.

10.   The Barovic Refusal included a purported "Resolution of the Board of Directors Adopting the Conclusions and Recommendations of the Demand Review Committee" (hereinafter referred to as the "Resolution"), which totaled less than three pages.  The Resolution contended that among other things, the DRC reviewed thousands of documents and "conducted relevant witness interviews."  The Resolution concluded that the Barovic Demand did not contain facts "to support any viable claim for breach of fiduciary duty," that the allegations in the Barovic Demand did "not give rise to legally viable claims against any of the Company's current or former officers or directors," and that "the Company undertook and adopted significant remedial measures" before receiving the Barovic Demand.

11.   The Barovic Refusal (that is, Muck's one page letter and the two and a half page Resolution) is wholly improper.  By issuing the conclusory Resolution and cover letter, the defendants have attempted to insulate their investigation from any scrutiny, which is unreasonable.  Barovic has received no report whatsoever from the DRC, other than the Resolution described above.  Astoundingly, the Resolution found that the Barovic Demand did not contain facts to support any viable claim for breach of fiduciary duty [against the defendants], even though the defendants caused the Company ***to admit to the wrongdoing and accept responsibility***.  The DRC's sweeping conclusion that no breach of fiduciary duty occurred, when coupled with the defendants taking "full responsibility," creates reasonable doubt that the DRC's investigation was conducted reasonably and in good faith.  The DRC has merely recited the conclusion that refusing the Barovic Demand was proper, without

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 4
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

sufficiently explaining how the DRC reached that conclusion. The defendants and the DRC have essentially asked Barovic to "take their word for it" regarding the thoroughness of the investigation, even though they have made no record.

12. Moreover, there is the critical issue of witness interviews. The Resolution simply states that the DRC "conducted relevant witness interviews," but provides absolutely no detail whatsoever regarding who was interviewed or what questions were asked. As a result, Barovic's counsel engaged in extensive correspondence with Muck regarding this issue. Finally, on March 26, 2014, Barovic's counsel received a letter from Muck (the "March 26, 2014 Letter") which purported to answer Barovic's questions regarding witness interviews. A true and correct copy of the March 26, 2014 Letter is attached hereto at Exhibit C.

13. First, the March 26, 2014 Letter informed Barovic's counsel that the DRC declined to identify the names of the specific witnesses interviewed. The March 26, 2014 Letter further stated that thirty-six individuals were interviewed, including members of the Board and the Board's Antitrust Compliance Committee, a former president of Microsoft's Windows division, members of Microsoft's Legal and Corporate Affairs department, members of the Windows Sustained Engineering team, employees in Advertising and Consumer Support, an executive in Windows Marketing, an employee in Windows Testing, and an employee in Original Equipment Manufacturer Sales.

14. The most notable aspect of the list of interviewees was the omissions. Specifically, it is readily apparent that ***the DRC never interviewed Almunia or any member of the European Commission***. It is clear that when conducting its interviews, the DRC did not interview a single individual who would corroborate Barovic's claims of wrongful conduct. There can be no doubt that any reasonable investigation of the Barovic Demand should have, at

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

minimum, included an interview of Almunia, or some other member of the European Commission with comparable knowledge of the European Commission Investigation.

15.     Also as a result of the above, on March 21, 2013, DiPhilipo issued a pre-suit demand pursuant to Washington law (the "DiPhilipo Demand") on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company.  A true and correct copy of the DiPhilipo Demand is attached hereto at Exhibit D.

16.     Over ten months later, on January 28, 2014, DiPhilipo's counsel received a letter from attorney Muck of the law firm Fenwick, informing DiPhilipo's counsel that the DiPhilipo Demand was being refused in its entirety.  This correspondence of January 28, 2014 shall be referred to as the "DiPhilipo Refusal."  The DiPhilipo Refusal informed DiPhilipo's counsel that Fenwick was counsel to a purported DRC, consisting of two directors (defendants Stephen Luczo and Dina Dublin, both further defined herein), who were purportedly appointed to investigate the allegations in the DiPhilipo Demand.  A true and correct copy of the Refusal is attached hereto at Exhibit E.

17.     The DiPhilipo Refusal included a purported "Resolution of the Board of Directors Adopting the Conclusions and Recommendations of the Demand Review Committee" (hereinafter referred to as the "Resolution"), which totaled less than three pages.   The Resolution contended that among other things, the DRC reviewed thousands of documents and "conducted relevant witness interviews."  The Resolution concluded that the DiPhilipo Demand did not contain facts "to support any viable claim for breach of fiduciary duty," that the allegations in the DiPhilipo Demand did "not give rise to legally viable claims against any of the Company's current or former officers or directors," and that "the Company undertook and

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1  adopted significant remedial measures" before receiving the DiPhilipo Demand.

2      18.    The DiPhilipo Refusal (that is, Muck's one page letter and the two and a half

3  page Resolution) is wholly improper.  By issuing the conclusory Resolution and cover letter,

4  the defendants have attempted to insulate their investigation from any scrutiny, which is

5  unreasonable.  DiPhilipo has received no report whatsoever from the DRC, other than the

6  Resolution described above.  Astoundingly, the Resolution found that the DiPhilipo Demand

7  did not contain facts to support any viable claim for breach of fiduciary duty [against the

8  defendants], even though the defendants caused the Company ***to admit to the wrongdoing and***

9  ***accept responsibility***.  The DRC's sweeping conclusion that no breach of fiduciary duty

10  occurred, when coupled with the defendants taking "full responsibility," creates reasonable

11  doubt that the DRC's investigation was conducted reasonably and in good faith.  The DRC has

12  merely recited the conclusion that refusing the DiPhilipo Demand was proper, without

13  sufficiently explaining how the DRC reached that conclusion.  The defendants and the DRC

14  have essentially asked DiPhilipo to "take their word for it" regarding the thoroughness of the

15  investigation, even though they have made no record.

16      19.    Moreover, there is the critical issue of witness interviews.  The Resolution

17  simply states that the DRC "conducted relevant witness interviews," but provides absolutely no

18  detail whatsoever regarding who was interviewed or what questions were asked. As a result,

19  DiPhilipo's counsel has no idea if the individuals with the most knowledge of the facts were

20  even interviewed.

21      20.    Clearly, the Board's  and the DRC's complete disregard of the actual merits of

22  the claims set forth in the Barovic Demand and the DiPhilipo Demand is improper and

23  demonstrates the Board's lack of diligence and good faith.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 7
2:14-cv-00540-JCC
2:14-cv-00586-JCC

21.     Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

23.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

24.     Plaintiff Barovic is a current shareholder of Microsoft and has continuously held Microsoft stock since 2010.  Barovic is a citizen of Wisconsin.

25.     Plaintiff DiPhilipo is a current shareholder of Microsoft and has continuously held Microsoft stock since 2010.  DiPhilipo is a citizen of Massachusetts.

26.     Nominal defendant Microsoft is a Washington corporation with its headquarters located at One Microsoft Way Redmond, Washington 98052-6399.  According to its public filings, Microsoft is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

27.     Defendant Steven A. Ballmer ("Ballmer") served as the Company's Chief Executive Officer ("CEO") from 2000 until February 14, 2014, and has served as a director of the Company since 2000.   Upon information and belief defendant Ballmer is a citizen of Washington.

28.     Defendant Dina D. Dublon ("Dublon") has served as a director of the Company since March 2005.  In addition, defendant Dublon served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Dublon is a member of the DRC.  Upon information and belief defendant Dublon is a citizen of New York.

29.     Defendant William H. Gates III ("Gates"), the Company's founder, has served as a director of the Company since 1981, and served as Chairman of the Board until February 4, 2014.  Gates currently serves as the Company's Technology Advisor.  Gates served as the Company's CEO from 1975 until 2000.  Upon information and belief defendant Gates is a citizen of Washington.

30.     Defendant Maria M. Klawe ("Klawe") has served as a director of the Company since March 2009.  Upon information and belief defendant Klawe is a citizen of California.

31.     Defendant Stephen J. Luczo ("Luczo") served as a director of the Company from 2012 until March 2014.   In addition, defendant Luczo served as a member of the Audit Committee during the Relevant Period.  Luczo is a member of the DRC.  Upon information and belief defendant Luczo is a citizen of California.

32.     Defendant David F. Marquardt ("Marquardt") has served as a director of the Company since June 30, 1981.  Upon information and belief defendant Marquardt is a citizen of California.

33.     Defendant Charles H. Noski ("Noski") has served as a director of the Company

since November 2003.  In addition, defendant Noski served as Chair of the Audit Committee during the Relevant Period.  Upon information and belief defendant Noski is a citizen of California.

34.     Defendant Helmut Panke ("Panke") has served as a director of the Company since November 11, 2003.  In addition, defendant Panke served as a member of the Audit Committee during the Relevant Period.  Upon information and belief defendant Panke is a citizen of Germany.

35.     Defendant John W. Thompson ("Thompson") has served as a director of the Company since February 2012 and as Chairman of the Board since February 4, 2014.  Upon information and belief defendant Thompson is a citizen of California.

36.     Defendant Peter S. Klein ("Klein") served as the Company's Chief Financial Officer ("CFO") from 2009 until May 8, 2013.  Upon information and belief defendant Klein is a citizen of Washington.

37.     Defendant Brad Smith ("Smith") serves as the Company's General Counsel and Executive Vice President, Legal and Corporate Affairs, as well as Corporate Secretary and Chief Compliance Officer.  Upon information and belief defendant Smith is a citizen of Washington.

38.     Defendant B. Kevin Turner ("Turner") has served as the Company's Chief Operating Officer ("COO") since 2006.  Upon information and belief defendant Turner is a citizen of Washington.

39.     Collectively, defendants Ballmer, Dublon, Gates, Klawe, Luczo, Marquardt, Noski, Panke, Thompson, Klein, Smith and Turner shall be referred to herein as "Defendants."

40.     Collectively, defendants Noski, Dublon, Luczo and Panke shall be referred to

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 10
2:14-cv-00540-JCC
2:14-cv-00586-JCC

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

herein as the "Audit Committee Defendants."

**DEFENDANTS' DUTIES**

41.     By reason of their positions as officers, directors, and/or fiduciaries of Microsoft and because of their ability to control the business and corporate affairs of Microsoft, Defendants owed Microsoft and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Microsoft in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Microsoft and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Microsoft and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.     Defendants, because of their positions of control and authority as directors and/or officers of Microsoft, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Microsoft, each of the Defendants had knowledge of material non-public information regarding the Company.

43.     To discharge their duties, the officers and directors of Microsoft were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Microsoft were required to, among other things:

   a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 11
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

44.   Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required to review with the Compliance Officer legal and regulatory matters that may have a material impact on the financial statements or internal controls over financial reporting, related Company compliance policies and programs, and related reports received from regulators.   In addition, the members of the Audit Committee are required to review adequacy of the Company's internal controls, as well as the Company's quarterly and annual financial filings with the United States Securities and Exchange Commission ("SEC").

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and its European Troubles

45.   According to its public filings, Microsoft is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

46.   Microsoft has had troubles with EU officials since at least 1998, largely for anticompetitive behavior.   For instance, in that year, European regulators began to probe Microsoft with respect to the inclusion of its media player with Windows, and for the use of confidential coding to favor the Microsoft desktop and server software.   All of this was said to stifle Microsoft's competition.   Although (many of the) Defendants caused Microsoft to fight the charges, Microsoft's arguments were dismissed in 2004 (and then again on appeal in 2007).   In or about October 2007, Defendants caused Microsoft to abandon its efforts to overturn the

ruling, and caused Microsoft to pay the equivalent of about $2.4 billion in fines and penalties.

47.     Meanwhile, EU officials were probing the Company regarding additional antitrust violations with respect to the inclusion of Internet Explorer (and only Internet Explorer) with Windows.  On December 16, 2009, EU regulators dropped the antitrust case against Microsoft after Defendants caused the Company to agree to offer consumers a choice of rival Web browsers with Windows.  The Settlement was a five-year deal, whereby European Windows users would be given a choice of 11 competing web browsers, including those made by Apple, Google and Mozilla.  Under the terms of the Settlement, by mid-March 2010, Microsoft was to send ballot screens via automatic software updates to 100 million users of Windows XP, Vista and Windows 7 in Europe who had set Internet Explorer as their main browser.  Further, Microsoft was to send the ballot screens to purchasers of new Windows-based computers (estimated to be 30 million a year).  European users of Windows would be given a "choice screen," which would allow them to easily switch from Internet Explorer to other Web browsers.  By stipulating to the Settlement under Defendants' direction and on their watch, Microsoft avoided paying a fine to EU officials.  Critically, pursuant to the terms of the Settlement, Microsoft itself was directly responsible for monitoring its own compliance with the Settlement over the next five years.

48.     On December 16, 2009, Defendants issued a press release regarding the Settlement, which contained a statement by defendant Smith, the Company's Senior Vice President and General Counsel.  This press release set forth, in relevant part:

> We are pleased with today's decision by the European Commission, which approves a final resolution of several longstanding competition law issues in Europe. We look forward to building on the dialogue and trust that has been established between Microsoft and the Commission and to extending our industry leadership on interoperability.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Today's resolution follows years of intensive examination by the European Commission of competition in computer software. The measures approved today reflect multiple rounds of input from industry participants relating to competition in Web browser software and interoperability between various Microsoft products and competing products.

The Web browser measures cover the inclusion of Internet Explorer in Windows for users in Europe—specifically the region known as the European Economic Area, which includes 30 nations. ***Under today's resolution, Microsoft commits that PC manufacturers and users will continue to be able to install any browser on top of Windows, to make any browser the default browser on new PCs, and to turn access to Internet Explorer on or off. In addition, Microsoft will send a "browser choice" screen to Windows users who are running Internet Explorer as their default browser. This browser choice screen will present a list of browsers, making it easy for users to install any one of them. It will be provided both to users of new computers and to the installed base of Windows XP, Windows Vista, and Windows 7 computers in Europe where Internet Explorer is set as the default browser.***

The second measure is a "public undertaking" that covers interoperability with Microsoft's products—the way our high-share products work with non-Microsoft technologies. This applies to an important set of Microsoft's products—our Windows, Windows Server, Office, Exchange, and SharePoint products. We believe it represents the most comprehensive commitment to the promotion of interoperability in the history of the software industry. Under this undertaking, Microsoft will ensure that developers throughout the industry, including in the open source community, will have access to technical documentation to assist them in building products that work well with Microsoft products. Microsoft will also support certain industry standards in its products and fully document how these standards are supported. Microsoft will make available legally-binding warranties that will be offered to third parties.

Our interoperability undertaking reflects the policy outlined by the European Commission in a major policy speech given by Commissioner Neelie Kroes in June 2008. At that time, the Commissioner said that companies offering high-share software products should be required to (i) disclose technical specifications to enable interoperability; (ii) ensure that competitors can access complete and accurate information and have a remedy if not; and (iii) ensure that the technical specifications are available at fair royalty rates, based on the inherent value of the technology disclosed. Our interoperability undertaking, developed through extensive consultation, implements this approach in full.

As we've said before, we are embarking on a path that will require significant change within Microsoft. Nevertheless, we believe that these are important steps

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

that resolve these competition law concerns.

This is an important day and a major step forward, and we look forward to building a new foundation for the future in Europe. [Emphasis added.]

### Defendants Cause the Company to Violate the Settlement

49.     Beginning in February 2011, under Defendants' direction and on their watch, the Company blatantly violated the terms of the Settlement.  At that time, in direct violation of the Settlement, Defendants caused Microsoft to eliminate the choice screen from *at least 15 million installations* of Windows 7 in Europe, making Internet Explorer the only Web browser available on these installations.

50.     On July 28, 2011, Defendants caused the Company to file with the SEC an annual report on Form 10-K the ("2011 10-K"), which was signed by  defendants Ballmer, Gates, Dublon, Klawe, Marquardt, Noski, Panke and Klein.   In addition, the 2011 10-K contained certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX Certifications"), signed by defendants Ballmer and Klein, who stated:

I, [Steven A. Ballmer/Peter S. Klein], certify that:

1. I have reviewed this annual report on Form 10-K of Microsoft Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 15
2:14-cv-00540-JCC
2:14-cv-00586-JCC

defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's Board of Directors (or persons performing the equivalent functions):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

In connection with the Annual Report of Microsoft Corporation, a Washington corporation (the "Company"), on Form 10-K for the year ended June 30, 2011, as filed with the Securities and Exchange Commission (the "Report"), [Steven A.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Ballmer, Chief Executive Officer of the Company/Peter S. Klein, Chief Financial Officer of the Company], does hereby certify, pursuant to § 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350), that to his knowledge:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

51.    In addition, the 2011 10-K set forth the following, in relevant part:

The European Commission closely scrutinizes the design of high-volume Microsoft products and the terms on which we make certain technologies used in these products, such as file formats, programming interfaces, and protocols, available to other companies. In 2004, the Commission ordered us to create new versions of Windows that do not include certain multimedia technologies and to provide our competitors with specifications for how to implement certain proprietary Windows communications protocols in their own products. In 2009, the Commission accepted a set of commitments offered by Microsoft to address the Commission's concerns relating to competition in Web browsing software. The Commission's impact on product design may limit our ability to innovate in Windows or other products in the future, diminish the developer appeal of the Windows platform, and increase our product development costs. The availability of licenses related to protocols and file formats may enable competitors to develop software products that better mimic the functionality of our own products which could result in decreased sales of our products.

52.    The 2011 10-K was false and misleading at the time it was issued.  The 2011 10-K failed to disclose that the Defendants were causing the Company to violate the Settlement, which could expose the Company to hundreds of millions of dollars in fines.

53.    In the summer of 2012, although Microsoft was responsible for monitoring its own compliance with the Settlement, EU antitrust chief Almunia warned Defendants that on some occasions Microsoft software was not providing users the full access to competing Web browsers, as was stipulated in the Settlement.  Defendants "apologized" to Almunia, calling it a "technical problem."  Yet despite the apology, Defendants did nothing to halt the illicit scheme, occurring under their direction and on their watch.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 17
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

**The Truth Begins to Emerge**

54.     In October 2012, months after Almunia warned Defendants and months after Defendants' "apology," Almunia charged Microsoft with failing to abide by the terms of the Settlement.  Further, Almunia put Defendants on notice that Microsoft must include adequate access to rival browsers in European version of the Windows 8 operating system, which was about to go on sale.

55.     On March 6, 2013, it was announced that European regulators had fined Microsoft an extraordinary €561 million, or approximately ***$732.2 million***, for violating the Settlement.  Notably, this was the first time in history that the EU had punished a company for violating the terms of an antitrust settlement.

56.     That same day, *The New York Times* ("*NYT*") published an article entitled "European Regulators Fine Microsoft, Then Promise to Do Better."  The article set forth, in relevant part:

> The European Union fined Microsoft $732 million on Wednesday for failing to respect an antitrust settlement with regulators. But in a highly unusual mea culpa, the European Union's top antitrust regulator said that his department bore some of the responsibility for Microsoft's failure to respect a settlement that caused the fine.

> Joaquín Almunia, the European Union competition commissioner, said the bloc had been "naïve" to put Microsoft in charge of monitoring its adherence to the deal it agreed to in 2009, when his predecessor let the company escape a fine in exchange for offering users of its Windows software a wider choice of Internet browsers.

> Mr. Almunia insisted that the enforcement of settlements could be sufficiently strengthened to ensure that companies abide by their pledges, and he signaled that he would not retreat from his goal to use such deals to avoid lengthy legal battles with major companies in swiftly evolving technology markets.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 18
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Settlements "allow for rapid solutions to competition problems," Mr. Almunia said. "Of course such decisions require strict compliance" and the "failure to comply is a very serious infringement that must be sanctioned accordingly."

***Microsoft had agreed to alter Windows for five years to give users of newly purchased computers in Europe a ballot screen that would allow them to easily download other browsers from the Internet and to turn off Microsoft's browser, Internet Explorer.***
***Microsoft told the commission at the end of 2011 that it had been abiding by the deal. "We trusted the reports about the compliance," Mr. Almunia said Wednesday.***

***In fact, the company failed to include the ballot system in certain products starting in May 2011, affecting more than 15 million European users. The lapse came to light last July, after rival companies reported its absence.***

***"We take full responsibility for the technical error that caused this problem and have apologized,"*** Microsoft said Wednesday. "We have taken steps to strengthen our software development and other processes to help avoid this mistake — or anything similar — in the future."

A Microsoft spokesman declined to comment on whether the company would appeal, but it seemed unlikely, as the company prefers to focus on its rivalry with Google. Microsoft is among the companies that have complained about Google's business practices to Mr. Almunia.

\*       \*       \*

Mr. Almunia said he had not yet decided whether to appoint a trustee to oversee whether Microsoft was adhering to the rest of its compliance period in the browser case, which runs to 2014.

***Microsoft has been a special case in the history of European Union antitrust enforcement, racking up a total of $3.4 billion in fines over about a decade.***

Microsoft was the first company to pay so-called periodic penalties for failing to follow an order to make it easier for rival products to communicate with powerful server computers running Windows. That amount, nearly 900 million euros, was subsequently reduced to 860 million euros after the company appealed to the General Court of the European Union.

***The decision against Microsoft was another milestone for European Union antitrust law, and for Microsoft, which became the first company to be punished for failing to adhere to a settlement.*** [Emphasis added.]

57.    Also that day, *Computerworld.com* published an article entitled "EU let

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Microsoft police itself on browser ballot promises."[1]  This article set forth, in relevant part:

Europe's antitrust agency had put Microsoft on the honor system, letting the company monitor its own compliance with a 2009 settlement that required it to offer other browsers to Windows users, the EU's top regulator admitted.

That eventually led to the Brussels-based European Commission slapping a $732 million fine on Microsoft today.

*"The reports we were receiving had not signaled us of this breach," said Joaquin Almunia, the head of the antitrust agency, when asked how the oversight went undetected for over a year.*

*Those reports, it turned out, were coming from Microsoft. "We trusted in the reports on the compliance [from Microsoft]," said Almunia. "We were not trying to explore Windows Service Pack 1. But maybe we should have tried to complement their reports."*

He admitted the Commission may have made a mistake letting Microsoft police itself, rather than appointing an external overseer. "In 2009, we were even more naive than today," Almunia added. He also suggested that the agency would change how it monitors deals struck in the future.

The 2009 agreement required Microsoft to show European Windows users a browser ballot, a screen that displayed download links to rivals' browsers, including Google's Chrome, Mozilla's Firefox and Opera Software's Opera.

But Microsoft made what it has repeatedly called a "technical error" when it omitted the ballot from Windows 7 Service Pack 1 (SP1) for 14 months, from May 2011 until July 2012. Approximately 15.3 million users did not see the ballot as intended, said Almunia.

*One U.S. antitrust expert struggled to understand why EU regulators let Microsoft supervise itself.*

*"The Federal Trade Commission, where I used to work, has an entire compliance department, with lawyers and economists, to make sure orders are complied with," said Robert Lande, a law professor at the University of Baltimore and director of the American Antitrust Institute. "That's kind of elementary. It's not rocket science."*

[1] Article available at:
http://www.computerworld.com/s/article/9237392/EU_let_Microsoft_police_itself_on_browser_ballot_promises

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 20
2:14-cv-00540-JCC
2:14-cv-00586-JCC

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Lande also blasted the Commission for allowing a repeat offender to police itself. *"Why would you put a three-time offender on the honor system?" Lande asked, referring to other antitrust actions against Microsoft, both in the U.S. and in the EU, that have resulted in billions in fines.*

Today, Microsoft reiterated what it has said since mid-2012. "We take full responsibility for the technical error that caused this problem and have apologized for it," the company said in a statement. "We provided the Commission with a complete and candid assessment of the situation, and we have taken steps to strengthen our software development and other processes to help avoid this mistake -- or anything similar -- in the future."

Microsoft's quick admission of the omission, multiple apologies, and cooperation with the EU authorities, were factors Almunia took into consideration when deciding on a fine, he said today.

According to Microsoft, the browser ballot was left out of Windows 7 SP1 when an engineering team forgot to update code that distributed the choice screen.

*Microsoft did not report the oversight to the Commission: As late as December 2011, months after the ballot stopped being shown, Microsoft reported that everything was fine. Instead, an unnamed complainant alerted the EU.* Almunia has declined to identify the complaint's origin, but one possible suspect is Mozilla, which has been the most vocal of all of Microsoft's browser rivals about its practices.

*Lande thought the explanation incredulous. "You can't say it's accidental for 15 months," he argued today. "Microsoft says it was a technical glitch, okay, one month, I understand, you left it out of a batch. But not for 15 months. That doesn't look like an accident to me."*

It's unlikely that Microsoft will appeal the fine, what with its public apologies and admission of guilt. Today, however, the company declined to comment on its plans. [Emphasis added.]

58.     Despite the enormous and unprecedented fine at issue, Defendants issued an extremely short statement in response to the disastrous situation, purportedly taking "full responsibility" but again maintaining that the violation of the Settlement was merely a "technical error."  Moreover, Defendants offered no explanation as to how the Settlement could have been violated, even though Microsoft itself was responsible for monitoring its own

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1   compliance with the Settlement.  The statement, contained in a press release (and reprinted in

2   the *NYT* article above), read as follows:

3       ***We take full responsibility*** for the technical error that caused this problem and
        have apologized for it. We provided the Commission with a complete and candid
4       assessment of the situation, and we have taken steps to strengthen our software
        development and other processes to help avoid this mistake – or anything similar
5       – in the future.

6   59.    As a result of Defendants' actions (which they have admitted to), the Company

7   has suffered damages.

8                           **DERIVATIVE AND DEMAND ALLEGATIONS**

9

10  60.    Plaintiffs bring this action derivatively in the right and for the benefit of

11  Microsoft to redress the breaches of fiduciary duty and other violations of law by Defendants.

12  61.    Plaintiffs will adequately and fairly represent the interests of Microsoft and its

13  shareholders in enforcing and prosecuting its rights.

14                                  **The Barovic Demand**

15

16  62.    As a result of the actions set forth above, on March 22, 2013, Barovic issued the Barovic

17  Demand pursuant to Washington law on the Board to investigate and commence an action

18  against certain current and/or former directors and executive officers of the Company.  *See*

19  Exhibit A.

20  63.    Over ten months later, on January 28, 2014, Barovic's counsel received the

21  Barovic Refusal from attorney Muck of the law firm Fenwick, informing Barovic's counsel that

22  the Barovic Demand was being refused in its entirety.  The Barovic Refusal informed Barovic's

23  counsel that Fenwick was counsel to a purported DRC, consisting of defendants Luczo and

24  Dublin, who were purportedly appointed to investigate the allegations in the Barovic Demand.

25  *See* Exhibit B.

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

64.     The Barovic Refusal included the purported Resolution, which totaled less than three pages.  The Resolution contended that among other things, the DRC reviewed thousands of documents and "conducted relevant witness interviews."  The Resolution concluded that the Barovic Demand did not contain facts "to support any viable claim for breach of fiduciary duty," that the allegations in the Barovic Demand did "not give rise to legally viable claims against any of the Company's current or former officers or directors," and that "the Company undertook and adopted significant remedial measures" before receiving the Barovic Demand.

65.     The Barovic Refusal (that is, Muck's one page letter and the two and a half page Resolution) are wholly improper.  By issuing the conclusory Resolution and cover letter, Defendants have attempted to insulate their investigation from any scrutiny, which is unreasonable.  Barovic has received no report whatsoever from the DRC, other than the Resolution described above.  Astoundingly, the Resolution found that the Barovic Demand did not contain facts to support any viable claim for breach of fiduciary duty [against Defendants], even though Defendants caused the Company *to admit to the wrongdoing and accept responsibility*.  The DRC's sweeping conclusion that no breach of fiduciary duty occurred, when coupled with Defendants taking "full responsibility," creates reasonable doubt that the DRC's investigation was conducted reasonably and in good faith.  The DRC has merely recited the conclusion that refusing the Barovic Demand was proper, without sufficiently explaining how the DRC reached that conclusion.  Defendants and the DRC have essentially asked Barovic to "take their word for it" regarding the thoroughness of the investigation.

66.     Moreover, there is the critical issue of witness interviews.  The Resolution simply states that the DRC "conducted relevant witness interviews," but gives absolutely no detail whatsoever regarding who was interviewed or what questions were asked.  As a result,

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Barovic's counsel engaged in extensive correspondence with Muck regarding this issue. Finally, on March 26, 2014, Barovic's counsel received the March 26, 2014 Letter, which purported to answer Barovic's questions regarding witness interviews. *See* Exhibit C.

67.     First, the March 26, 2014 Letter informed Barovic's counsel that the DRC declined to identify the names of the specific witnesses interviewed. The March 26, 2014 Letter went on to say that thirty-six individuals were interviewed, including members of the Board and the Board's Antitrust Compliance Committee, a former president of Microsoft's Windows division, members of Microsoft's Legal and Corporate Affairs department, members of the Windows Sustained Engineering team, employees in Advertising and Consumer Support, an executive in Windows Marketing, an employee in Windows Testing, and an employee in Original Equipment Manufacturer Sales.

68.     The most notable aspect of the list of interviewees was the omissions. Specifically, it is readily apparent that *the DRC never interviewed Almunia or any member of the European Commission*. It is clear that when conducting its interviews, the DRC did not interview a single individual who would corroborate Barovic's claims of wrongful conduct. There can be no doubt that any reasonable investigation of the Barovic Demand should have, at minimum, included an interview of Almunia, or some other member of the European Commission with comparable knowledge of the European Commission Investigation.

69.     Clearly, the Board's  and the DRC's complete disregard of the actual merits of the claims set forth in the Barovic Demand is improper and demonstrates the Board's lack of diligence and good faith.

### The DiPhilipo Demand

70.     Also as a result of the above, on March 21, 2013, DiPhilipo issued the DiPhilipo

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 24
2:14-cv-00540-JCC
2:14-cv-00586-JCC

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Demand on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company. *See* Exhibit D.

71.     Over ten months later, on January 28, 2014, DiPhilipo's counsel received a letter from attorney Muck of the law firm Fenwick, informing DiPhilipo's counsel that the DiPhilipo Demand was being refused in its entirety.  The DiPhilipo Refusal informed DiPhilipo's counsel that Fenwick was counsel to a purported DRC, consisting of two directors (defendants Stephen Luczo and Dina Dublin, both further defined herein), who were purportedly appointed to investigate the allegations in the DiPhilipo Demand. *See* Exhibit E.

72.     The DiPhilipo Refusal included a purported Resolution, which totaled less than three pages.  The Resolution contended that among other things, the DRC reviewed thousands of documents and "conducted relevant witness interviews."  The Resolution concluded that the DiPhilipo Demand did not contain facts "to support any viable claim for breach of fiduciary duty," that the allegations in the DiPhilipo Demand did "not give rise to legally viable claims against any of the Company's current or former officers or directors," and that "the Company undertook and adopted significant remedial measures" before receiving the DiPhilipo Demand.

73.     The DiPhilipo Refusal (that is, Muck's one page letter and the two and a half page Resolution) is wholly improper.  By issuing the conclusory Resolution and cover letter, the defendants have attempted to insulate their investigation from any scrutiny, which is unreasonable.  DiPhilipo has received no report whatsoever from the DRC, other than the Resolution described above.  Astoundingly, the Resolution found that the DiPhilipo Demand did not contain facts to support any viable claim for breach of fiduciary duty [against the defendants], even though the defendants caused the Company *to admit to the wrongdoing and accept responsibility*.  The DRC's sweeping conclusion that no breach of fiduciary duty

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

occurred, when coupled with the defendants taking "full responsibility," creates reasonable doubt that the DRC's investigation was conducted reasonably and in good faith.  The DRC has merely recited the conclusion that refusing the DiPhilipo Demand was proper, without sufficiently explaining how the DRC reached that conclusion.  The defendants and the DRC have essentially asked DiPhilipo to "take their word for it" regarding the thoroughness of the investigation, even though they have made no record.

74.     Moreover, there is the critical issue of witness interviews.  The Resolution simply states that the DRC "conducted relevant witness interviews," but provides absolutely no detail whatsoever regarding who was interviewed or what questions were asked. As a result, DiPhilipo's counsel has no idea if the individuals with the most knowledge of the facts were even interviewed.

75.     Clearly, the Board's  and the DRC's complete disregard of the actual merits of the claims set forth in the DiPhilipo Demand is improper and demonstrates the Board's lack of diligence and good faith.

### The Barovic Demand and the DiPhilipo Demand

76.     In sum, the Board's  and the DRC's complete disregard of the actual merits of the claims set forth in the Barovic Demand and the DiPhilipo Demand is improper and demonstrates the Board's lack of diligence and good faith.

77.     Thus, this shareholder derivative action should be allowed to proceed.

### COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING INACCURATE INFORMATION

78.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 26
2:14-cv-00540-JCC
2:14-cv-00586-JCC

79.     As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Microsoft disseminated accurate, truthful and complete information to its shareholders.

80.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Microsoft shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

81.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**
**FOR FAILING TO MAINTAIN INTERNAL CONTROLS**

82.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

83.     As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

84.     Defendants willfully ignored the obvious and pervasive problems with Microsoft's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

85.     As a direct and proximate result of the Defendants' foregoing breaches of

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 27
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

fiduciary duties, the Company has sustained damages.

**COUNT III**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR**
**FAILING TO PROPERLY MANAGE THE COMPANY**

86.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

87.     Defendants owed and owe Microsoft fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Microsoft the highest obligation of good faith, fair dealing and loyalty.

88.     Defendants had a fiduciary duty to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority, and when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence**.**

89.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

90.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Microsoft has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

91.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

92.     Plaintiffs, on behalf of Microsoft, have no adequate remedy at law.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

93.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

94.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Microsoft.

95.     Plaintiffs, as a shareholders and representatives of Microsoft, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

96.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

97.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Microsoft, for which they are legally responsible.   In particular, Defendants abused their positions of authority by causing or allowing Microsoft to violate the Settlement.

98.     As a direct and proximate result of Defendants' abuse of control, Microsoft has sustained significant damages.

99.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

100.    Plaintiffs, on behalf of Microsoft, have no adequate remedy at law.

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 29
2:14-cv-00540-JCC
2:14-cv-00586-JCC

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1

## COUNT VI
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

2

3

101.    Plaintiffs incorporate by reference and reallege each and every allegation set

4

forth above, as though fully set forth herein.

5

102.    Defendants had a duty to Microsoft and its shareholders to prudently supervise,

6

manage and control the operations, business and internal financial accounting and disclosure

7

controls of Microsoft.

8

103.    Defendants, by their actions and by engaging in the wrongdoing described

9

herein, abandoned and abdicated their responsibilities and duties with regard to prudently

10

managing the businesses of Microsoft in a manner consistent with the duties imposed upon

11

them by law.  By committing the misconduct alleged herein, Defendants breached their duties

12

of due care, diligence and candor in the management and administration of Microsoft's affairs

13

and in the use and preservation of Microsoft's assets.

14

104.    During the course of the discharge of their duties, Defendants knew or recklessly

15

disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

16

caused Microsoft to engage in the scheme complained of herein which they knew had an

17

unreasonable risk of damage to Microsoft, thus breaching their duties to the Company.  As a

18

result, Defendants grossly mismanaged Microsoft.

19

20

### PRAYER FOR RELIEF

21

WHEREFORE, Plaintiffs demand judgment as follows:

22

A.    Against all Defendants and in favor of the Company for the amount of damages

23

sustained by the Company as a result of Defendants' breaches of fiduciary duties;

24

25

26

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 30
2:14-cv-00540-JCC
2:14-cv-00586-JCC

B.      Directing Microsoft to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Microsoft restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED this 26th day of June, 2014.


                                    s/ Duncan C. Turner
                                    Duncan C. Turner, WSBA No. 20597
                                    BADGLEY MULLINS TURNER PLLC
                                    701 Fifth Avenue, Suite 4750
                                    Seattle, Washington, 98104
                                    Telephone:  (206) 621-6566
                                    Facsimile:  (206) 621-9686
                                    Email:  duncanturner@badgleymullins.com
                                    **Liaison Counsel for Plaintiffs**

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER (admitted *Pro Hac Vice*)
JEFFREY J. CIARLANTO (admitted *Pro Hac Vice*)
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**THE WEISER LAW FIRM, P.C.**
KATHLEEN A. HERKENHOFF
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Phone: (858) 794-1441
Facsimile:  (858) 794-1450

**RYAN & MANISKAS, LLP**
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: 484-588-5516
Facsimile: 484-450-2582

**Co-Lead Counsel for Plaintiffs**

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164

**Additional Counsel for Plaintiff Barovic**

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 32
2:14-cv-00540-JCC
2:14-cv-00586-JCC

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 26, 2014 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**DAVIS WRIGHT TREMAINE LLP**
Stephen Rummage
Brendan Mangan
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: (206) 757-8260
Facsimile: (206) 757-7260
*Counsel for the Individual Defendants*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Daniel J. Dunne
George E. Greer
Charles J. Ha
701 Fifth Avenue, Suite 5600
Seattle, WA 98104-7097
Telephone: (206) 839-4395
Facsimile: (206) 839-4301
*Counsel for Nominal Defendant Microsoft*

s/Duncan C. Turner
Duncan C. Turner, WSBA No. 20597
Badgley Mullins Turner, PLLC
19929 Ballinger Way NE, Suite 200
Shoreline, WA 98155
Telephone: 206-621-6566
Facsimile: 206-621-9686
Email: duncanturner@badgleymullins.com

VERIFIED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT - 33
2:14-cv-00540-JCC
2:14-cv-00586-JCC

MICROSOFT CORPORATION VERIFICATION

I, Kim Barovic, hereby verify that I am familiar with the allegations in the Verified

Consolidated Shareholder Complaint, that I have authorized the filing of the

Verified Consolidated Shareholder Complaint, and that the foregoing is true and

correct to the best of my knowledge, information and belief.

Date  6/25/2014

Kim Barovic

1

## **<u>VERIFICATION</u>**

I, Stephen DiPhilipo, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: ___6-24-14_____                    _____
                                                                                         Stephen DiPhilipo

# **<u>EXHIBIT A</u>**



THE
WEISER
LAW FIRM
WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE: (610) 408-8062

<u>CALIFORNIA</u>
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

March 22, 2013

**VIA CERTIFIED MAIL**
<u>**RETURN RECEIPT REQUESTED**</u>
William H. Gates III
Chairman of the Board of Directors
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

      Re:    <u>**Shareholder Demand Pursuant to Washington Law**</u>

Dear Mr. Gates:

      The undersigned firms represent Kim Barovic (the "Stockholder"), a current stockholder of Microsoft Corporation ("Microsoft" or the "Company"). Pursuant to Washington law, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including yourself ("Gates"), Steve Ballmer ("Ballmer"), Dina Dublon ("Dublon"), Maria M. Klawe ("Klawe"), Stephen J. Luczo ("Luczo"), David F. Marquardt ("Marquardt"), Charles H. Noski ("Noski"), Helmut Panke ("Panke"), John W. Thompson ("Thompson"), Peter Klein ("Klein"), Andrew Lees ("Lees"), Eric Rudder ("Rudder"), Brad Smith ("Smith") and B. Kevin Turner ("Turner"). Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

      As you are aware, by reason of their positions as officers and/or directors of Microsoft and because of their ability to control the business and corporate affairs of Microsoft, members of Management owed and owe Microsoft and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use its utmost ability to control and manage Microsoft in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that Management has violated these core fiduciary duty principles from at least 2011 through the present (the "Relevant Period"), causing Microsoft to suffer damages.

1

## I.   FACTUAL BACKGROUND

### A.   Background of the Company and its European Troubles

According to its public filings, Microsoft is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

Microsoft has had troubles with officials in the European Union ("EU") since at least 1998, largely for anticompetitive behavior. For instance, in that year, European regulators began to probe Microsoft with respect to the inclusion of its media player with the Windows operating system ("Windows"), and for the use of confidential coding to favor the Microsoft desktop and server software. All of this was said to stifle Microsoft's competition. Although Management caused Microsoft to fight the charges, Microsoft's arguments were dismissed in 2004 (and then again on appeal in 2007). In or about October 2007, Management caused Microsoft to abandon its efforts to overturn the ruling, and caused Microsoft to pay the equivalent of about $2.4 billion in fines and penalties.

Meanwhile, EU officials were probing the Company regarding additional antitrust violations with respect to the inclusion of Internet Explorer (and only Internet Explorer) with Windows. On December 16, 2009, EU regulators dropped the antitrust case against Microsoft after Management caused the Company to agree to offer consumers a choice of rival Web browsers with Windows (the "Settlement"). The Settlement was a five-year deal, whereby European Windows users would be given a choice of 11 competing web browsers, including those made by Apple, Google and Mozilla. Under the terms of the Settlement, by mid-March 2010, Microsoft was to send ballot screens via automatic software updates to 100 million users of Windows XP, Vista and Windows 7 in Europe who had set Internet Explorer as their main browser. Further, Microsoft was to send the ballot screens to purchasers of new Windows-based computers (estimated to be 30 million a year). European users of Windows would be given a "choice screen," which would allow them to easily switch from Internet Explorer to other Web browsers. By stipulating to the Settlement under Management's direction, Microsoft avoided paying a fine to EU officials.

On December 16, 2009, Management issued a press release regarding the Settlement, which contained a statement by Brad Smith, the Company's Senior Vice President and General Counsel. This press release set forth, in relevant part:

We are pleased with today's decision by the European Commission, which approves a final resolution of several longstanding competition law issues in Europe. We look forward to building on the dialogue and trust that has been established between Microsoft and the Commission and to extending our industry leadership on interoperability.

*Today's resolution follows years of intensive examination by the European Commission of competition in computer software. The measures approved today reflect multiple rounds of input from industry participants relating to competition in Web browser software and interoperability between various Microsoft products and competing products.*

The Web browser measures cover the inclusion of Internet Explorer in Windows for users in Europe—specifically the region known as the European Economic Area, which includes 30 nations. *Under today's resolution, Microsoft commits that PC manufacturers and users will continue to be able to install any browser on top of Windows, to make any browser the default browser on new PCs, and to turn access to Internet Explorer on or off. In addition, Microsoft will send a "browser choice" screen to Windows users who are running Internet Explorer as their default browser. This browser choice screen will present a list of browsers, making it easy for users to install any one of them. It will be provided both to users of new computers and to the installed base of Windows XP, Windows Vista, and Windows 7 computers in Europe where Internet Explorer is set as the default browser.*

*The second measure is a "public undertaking" that covers interoperability with Microsoft's products—the way our high-share products work with non-Microsoft technologies. This applies to an important set of Microsoft's products—our Windows, Windows Server, Office, Exchange, and SharePoint products. We believe it represents the most comprehensive commitment to the promotion of interoperability in the history of the software industry.* Under this undertaking, Microsoft will ensure that developers throughout the industry, including in the open source community, will have access to technical documentation to assist them in building products that work well with Microsoft products. Microsoft will also support certain industry standards in its products and fully document how these standards are supported. Microsoft will make available legally-binding warranties that will be offered to third parties.

Our interoperability undertaking reflects the policy outlined by the European Commission in a major policy speech given by Commissioner Neelie Kroes in June 2008. At that time, the Commissioner said that companies offering high-share software products should be required to (i) disclose technical specifications to enable interoperability; (ii) ensure that competitors can access complete and accurate information and have a remedy if not; and (iii) ensure that the technical specifications are available at fair royalty rates, based on the inherent value of the technology disclosed. Our interoperability undertaking, developed through extensive consultation, implements this approach in full.

As we've said before, we are embarking on a path that will require significant change within Microsoft. Nevertheless, we believe that these are important steps that resolve these competition law concerns.

*This is an important day and a major step forward, and we look forward to building a new foundation for the future in Europe.* [Emphasis added.]

**B.     Under Management's Direction, and Despite Warnings from the E.U., Microsoft Violates the Settlement Repeatedly**

Beginning in February 2011, under Management's direction, the Company blatantly

violated the terms of the Settlement.  At that time, in direct violation of the Settlement, Management caused Microsoft to eliminate the choice screen from *at least 15 million* installations of Windows 7 in Europe, making Internet Explorer the only Web browser available on these installations.

In the summer of 2012, the EU antitrust chief, Joaquín Almunia ("Almunia") warned Management that on some occasions Microsoft software was not providing users the full access to competing Web browsers, as was stipulated in the Settlement.  Management "apologized" to Almunia, calling it a "technical problem."  Yet despite the apology, Management did nothing to halt the illicit scheme.

### C.     The Truth Begins to Emerge

In October 2012, months after Almunia warned Microsoft officials and Management "apologized," Almunia charged Microsoft with failing to abide by the terms of the Settlement. Further, Almunia put Management on notice that Microsoft must include adequate access to rival browsers in European version of the Windows 8 operating system, which was about to go on sale.

On March 6, 2013, it was announced that European regulators had fined Microsoft an extraordinary *€561 million, or approximately $732.2 million*, for violating the Settlement. Notably, this was the first time in history that the EU had punished a company for neglecting to comply with the terms of an antitrust settlement.  Despite the enormous and unprecedented fine at issue, Management issued an extremely short statement in response to the disastrous situation, again maintaining that the violation of the Settlement was a "technical error."  The statement, contained in a press release, read as follows:

> We take full responsibility for the technical error that caused this problem and have apologized for it. We provided the Commission with a complete and candid assessment of the situation, and we have taken steps to strengthen our software development and other processes to help avoid this mistake – or anything similar – in the future.

## II.     DEMAND PURSUANT TO WASHINGTON LAW

Based on these events, the Stockholder contends that members of Management breached their fiduciary duties of loyalty and good faith by knowingly and causing and allowing the Company to violate the terms of the Settlement.  As a direct and proximate result of Management's actions, Microsoft has sustained damages, including (but not limited to) the extraordinary and historic fine of *€561 million ($732.2 million)* imposed by the EU.

Accordingly, pursuant to Washington law, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Washington and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

4

Pursuant to Washington law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

THE WEISER LAW FIRM, P.C.

Robert B. Weiser

cc:    Kim Barovic

# **<u>EXHIBIT B</u>**

**FENWICK & WEST LLP**

555 CALIFORNIA STREET, 12TH FLOOR   SAN FRANCISCO, CA 94104
TEL: 415.875.2300   FAX: 415.281.1350   WWW.FENWICK.COM

January 28, 2014

SUSAN S. MUCK

EMAIL SMUCK@FENWICK.COM
Direct Dial (415) 875-2325

**VIA E-MAIL AND FEDERAL EXPRESS**

Robert B. Weiser
The Weiser Law Firm
22 Cassatt Ave.
Berwyn, PA 19312

      Re:    *Shareholder Demand by Kim Barovic*

Dear Mr. Weiser:

      I write in reference to the March 22, 2013 shareholder demand sent to the Board of Directors of Microsoft Corporation on behalf of your client, Kim Barovic. As you know, Fenwick & West LLP is counsel to the Board committee, consisting of directors Stephen Luczo and Dina Dublon, that was appointed to investigate the allegations in your client's shareholder demand.

      The Committee has completed its investigation, and the Committee has presented its recommendation to the Board of Directors. After considering the Committee's recommendation, the Board voted to reject your client's shareholder demand. For your reference, I enclose a copy of the resolution adopted by the Board concerning your client's demand.

      Please feel free to contact me if you have any further questions about this matter.

               Sincerely,

               FENWICK & WEST LLP

               Susan S. Muck

Encl.

## RESOLUTION OF THE BOARD OF DIRECTORS
## ADOPTING THE CONCLUSIONS AND RECOMMENDATIONS
## OF THE DEMAND REVIEW COMMITTEE

WHEREAS, the Board of Directors of Microsoft Corporation (the "**Company**") received letters dated March 21, 2013, March 22, 2013, and April 17, 2013 from attorneys purportedly acting on behalf of Stephen DiPhilipo, Kim Barovic, and Randee Bernstein, respectively, purported stockholders of the Company (the "**Demand Letters**"), demanding that the Board of Directors conduct an investigation and thereafter initiate legal action on behalf of the Company against persons who allegedly engaged in the misconduct described in the Demand Letters;

WHEREAS, the issues described in the Demand Letters relate to the Company's failure to comply fully with its obligations under a set of binding commitments that Microsoft gave to the European Commission in December 2009 (the "**Commitments**") to deliver a "Browser Choice Screen" to certain personal computers in the European Economic Area, and to the €561 million fine imposed on the Company by the European Commission in March 2013;

WHEREAS, on May 10, 2013, the Board of Directors appointed a committee of the Board of Directors (the "**Demand Review Committee**"), consisting of independent directors Stephen J. Luczo and Dina Dublon, to review, investigate, and make a recommendation to the Board of Directors as to what actions, if any, are necessary or appropriate and in the best interests of the Company and its stockholders in light of the Demand Letters, in accordance with Washington law, including whether to assert the claims made in the Demand Letters or any other claims concerning related subject matters, and, if so, how;

WHEREAS, the Board of Directors determined that the members of the Demand Review Committee are disinterested directors for purposes of reviewing and investigating the allegations contained in the Demand Letters;

WHEREAS, the Demand Review Committee retained experienced independent counsel from the law firm of Fenwick & West LLP to assist the Committee in investigating the allegations contained in the Demand Letters;

WHEREAS, the Demand Review Committee investigated the allegations contained in the Demand Letters, and, specifically, the Demand Review Committee:

i.      Reviewed and analyzed the European Commission's March 2013 Decision and Findings;

ii.      Reviewed and analyzed the September 4, 2012 Report of Dechert LLP on Microsoft's Failure to Deliver the Browser Choice Screen to Windows 7 Service Pack 1 Personal Computers in Europe (the "**Dechert Report**");

iii.      Reviewed and analyzed the key documents identified by Dechert and relied on in the Dechert Report;

iv.      Reviewed over 10,000 additional documents;

v.      Conducted relevant witness interviews;

vi.     Analyzed the Company's internal controls and reporting structure relating to antitrust compliance, both before and after July 2012;

vii.    Researched and analyzed the standards of conduct for, and legal standards for imposing liability on, corporate officers and directors under Washington law;

viii.   Reviewed and analyzed relevant corporate and governance documents, including the Company's Articles of Incorporation, Bylaws, Corporate Governance Guidelines, Standards of Business Conduct, minutes from meetings of the Company's Board of Directors, Antitrust Compliance Committee, and Regulatory and Public Policy Committee, and relevant press releases and SEC filings;

ix.     Considered the Company's indemnification obligations to current and former officers and directors, as well as the Company's self-insured status; and

x.      Invited counsel for Stephen DiPhilipo, Kim Barovic, and Randee Bernstein to meet with counsel for the Demand Review Committee and to provide any information they believed that the Demand Review Committee should consider;

WHEREAS, the Demand Review Committee documented its conclusions and recommendations and presented its conclusions and recommendations to the Board of Directors;

WHEREAS, the Demand Review Committee, after careful deliberation and consideration of all of the information available to it, and in the good faith exercise of its business judgment and having considered the best interests of the Company and its stockholders, has concluded that it is not in the Company's best interests to pursue any claims based on the allegations contained in the Demand Letters because, among other reasons, the relevant facts do not support any viable claim for breach of fiduciary duty, the Company would not succeed in recovering damages from any of the individuals named in the Demand Letters or from any other individuals, the Company would not receive any meaningful non-monetary benefits as a result of pursing claims based on the allegations contained in the Demand Letters, the Company undertook and adopted significant remedial measures before it received any of the Demand Letters, and pursuing litigation based on the Demand Letters would result in substantial expense to the Company; and

WHEREAS, the Demand Review Committee has therefore recommended that the Board of Directors vote to reject the Demand Letters;

NOW, THEREFORE, in view of the foregoing, and after careful deliberation and discussion of all the information made available to the Board of Directors regarding the matters raised by the Demand Letters, and in the good faith exercise of its business judgment, the following resolution is adopted by the Board of Directors:

RESOLVED, that the investigation undertaken by the Demand Review Committee was reasonable, thorough, and undertaken in good faith with the assistance of experienced independent counsel, and that the inquiry was sufficient to allow members of the Board of Directors to reasonably rely on the Demand Review Committee's findings and conclusions in determining what response to the Demand Letters is in the best interests of the Company;

FURTHER RESOLVED, that based on the Demand Review Committee's thorough investigation and review of the applicable facts and law and the Demand Review Committee's recommendations to the Board of Directors, the Board of Directors concludes that the allegations contained in the Demand Letters do not give rise to legally viable claims against any of the Company's current or former officers or directors, that the Company would not succeed in recovering damages from any of the individuals named in the Demand Letters or from any other individuals, that the Company would not receive any meaningful non-monetary benefits as a result of pursuing claims based on the allegations contained in the Demand Letters, that the Company undertook and adopted significant remedial measures before it received any of the Demand Letters, and that pursuing litigation based on the Demand Letters would result in substantial expense to the Company; and

FURTHER RESOLVED, that the Board of Directors rejects the Demand Letters, declines to take any of the actions requested by the Demand Letters, and declines to permit any of Stephen DiPhilipo, Kim Barovic, or Randee Bernstein to initiate or pursue any litigation on the Company's behalf relating to any of the allegations contained in the Demand Letters or to any other matter.

# **<u>EXHIBIT C</u>**



**FENWICK & WEST LLP**

555 CALIFORNIA STREET, 12TH FLOOR   SAN FRANCISCO, CA 94104
TEL: 415.875.2300   FAX: 415.281.1350   WWW.FENWICK.COM

SUSAN S. MUCK

March 26, 2014

EMAIL SMUCK@FENWICK.COM
Direct Dial (415) 875-2325

**VIA E-MAIL**

Robert B. Weiser
The Weiser Law Firm
22 Cassatt Ave.
Berwyn, PA 19312

      Re:    *Shareholder Demand by Kim Barovic*

Dear Rob:

I write in response to your March 12, 2014 letter regarding the decision of the Microsoft Board of Directors Demand Review Committee ("Committee").  The Committee is confident that the browser choice screen issue has been investigated thoroughly, and while the Committee declines to identify the names of the specific witnesses interviewed, it is willing to provide you with the following information:   Thirty-six individuals were interviewed on one or more occasions, including members of Microsoft's Board of Directors and the Board's Antitrust Compliance Committee; a former president of Microsoft's Windows division; thirteen members of Microsoft's Legal and Corporate Affairs department, including members of its antitrust group and antitrust compliance team; ten members of the Windows Sustained Engineering team; two members of the Windows Product team; three members of the Windows Update team; two employees in Advertising and Consumer Support; one executive in Windows Marketing; one employee in Windows Testing; and one employee in Original Equipment Manufacturer Sales.

We believe the above information is more than sufficient to illustrate the thoroughness of the review, especially in light of the European Commission Decision and the detailed Board Resolution previously forwarded to you.

               Sincerely,

               FENWICK & WEST LLP

               Susan S. Muck

# **EXHIBIT D**



995 Old Eagle School Rd., Suite 311
Wayne, PA 19087
(T) 484-588-5516
(F) 484-450-2582
www.rmclasslaw.com

March 21, 2013

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
William H. Gates
Chairman of the Board of Directors
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

Re:   **Shareholder Demand Pursuant to Washington Law**

Dear Mr. Gates:

    The undersigned firm represents Stephen DiPhilipo (the "Stockholder"), a current stockholder of Microsoft Corporation ("Microsoft" or the "Company"). Pursuant to Washington law, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including yourself ("Gates"), Steve Ballmer ("Ballmer"), Dina Dublon ("Dublon"), Maria M. Klawe ("Klawe"), Stephen J. Luczo ("Luczo"), David F. Marquardt ("Marquardt"), Charles H. Noski ("Noski"), Helmut Panke ("Panke"), John W. Thompson ("Thompson"), Peter Klein ("Klein"), Andrew Lees ("Lees"), Eric Rudder ("Rudder"), Brad Smith ("Smith") and B. Kevin Turner ("Turner"). Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

    As you are aware, by reason of their positions as officers and/or directors of Microsoft and because of their ability to control the business and corporate affairs of Microsoft, members of Management owed and owe Microsoft and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use its utmost ability to control and manage Microsoft in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that Management has violated these core fiduciary duty principles from at

least 2011 through the present (the "Relevant Period"), causing Microsoft to suffer damages.

## I.   FACTUAL BACKGROUND

### A.   Background of the Company and its European Troubles

According to its public filings, Microsoft is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

Microsoft has had troubles with officials in the European Union ("EU") since at least 1998, largely for anticompetitive behavior. For instance, in that year, European regulators began to probe Microsoft with respect to the inclusion of its media player with the Windows operating system ("Windows"), and for the use of confidential coding to favor the Microsoft desktop and server software. All of this was done to stifle Microsoft's competition. Although Management caused Microsoft to fight the charges, Microsoft's arguments were dismissed in 2004 (and then again on appeal in 2007). In or about October 2007, Management caused Microsoft to abandon its efforts to overturn the ruling, and caused Microsoft to pay the equivalent of about $2.4 billion in fines and penalties.

Meanwhile, EU officials were probing the Company regarding additional antitrust violations with respect to the inclusion of Internet Explorer (and only Internet Explorer) with Windows. On December 16, 2009, EU regulators dropped the antitrust case against Microsoft after Management caused the Company to agree to offer consumers a choice of rival Web browsers with Windows (the "Settlement"). The Settlement was a five-year deal, whereby European Windows users would be given a choice of 11 competing web browsers, including those made by Apple, Google and Mozilla. Under the terms of the Settlement, by mid-March 2010, Microsoft was to send ballot screens via automatic software updates to 100 million users of Windows XP, Vista and Windows 7 in Europe who had set Internet Explorer as their main browser. Further, Microsoft was to send the ballot screens to purchasers of new Windows-based computers (estimated to be 30 million a year). European users of Windows would be given a "choice screen," which would allow them to easily switch from Internet Explorer to other Web browsers. By stipulating to the Settlement under Management's direction, Microsoft avoided paying a fine to EU officials.

On December 16, 2009, Management issued a press release regarding the Settlement, which contained a statement by Brad Smith, the Company's Senior Vice President and General Counsel. This press release set forth, in relevant part:

We are pleased with today's decision by the European Commission, which approves a final resolution of several longstanding competition law issues in Europe. We look forward to building on the dialogue and trust that has been

established between Microsoft and the Commission and to extending our industry leadership on interoperability.

*Today's resolution follows years of intensive examination by the European Commission of competition in computer software. The measures approved today reflect multiple rounds of input from industry participants relating to competition in Web browser software and interoperability between various Microsoft products and competing products.*

The Web browser measures cover the inclusion of Internet Explorer in Windows for users in Europe—specifically the region known as the European Economic Area, which includes 30 nations. *Under today's resolution, Microsoft commits that PC manufacturers and users will continue to be able to install any browser on top of Windows, to make any browser the default browser on new PCs, and to turn access to Internet Explorer on or off. In addition, Microsoft will send a "browser choice" screen to Windows users who are running Internet Explorer as their default browser. This browser choice screen will present a list of browsers, making it easy for users to install any one of them. It will be provided both to users of new computers and to the installed base of Windows XP, Windows Vista, and Windows 7 computers in Europe where Internet Explorer is set as the default browser.*

*The second measure is a "public undertaking" that covers interoperability with Microsoft's products—the way our high-share products work with non-Microsoft technologies. This applies to an important set of Microsoft's products—our Windows, Windows Server, Office, Exchange, and SharePoint products. We believe it represents the most comprehensive commitment to the promotion of interoperability in the history of the software industry.* Under this undertaking, Microsoft will ensure that developers throughout the industry, including in the open source community, will have access to technical documentation to assist them in building products that work well with Microsoft products. Microsoft will also support certain industry standards in its products and fully document how these standards are supported. Microsoft will make available legally-binding warranties that will be offered to third parties.

Our interoperability undertaking reflects the policy outlined by the European Commission in a major policy speech given by Commissioner Neelie Kroes in June 2008. At that time, the Commissioner said that companies offering high-share software products should be required to (i) disclose technical specifications to enable interoperability; (ii) ensure that competitors can access complete and accurate information and have a remedy if not; and (iii) ensure that the technical specifications are available at fair royalty rates, based on the inherent value of the technology disclosed. Our interoperability undertaking, developed through extensive consultation, implements this approach in full.

As we've said before, we are embarking on a path that will require significant change within Microsoft. Nevertheless, we believe that these are important steps that resolve these competition law concerns.

***This is an important day and a major step forward, and we look forward to building a new foundation for the future in Europe.*** [Emphasis added.]

**B.      Under Management's Direction, and Despite Warnings from the E.U., Microsoft Violates the Settlement Repeatedly**

Beginning in February 2011, under Management's direction, the Company blatantly violated the terms of the Settlement.  At that time, in direct violation of the Settlement, Management caused Microsoft to eliminate the choice screen from ***at least 15 million*** installations of Windows 7 in Europe, making Internet Explorer the only Web browser available on these installations.

In the summer of 2012, the EU antitrust chief, Joaquín Almunia ("Almunia") warned Management that on some occasions Microsoft software was not providing users the full access to competing Web browsers, as was stipulated in the Settlement.  Management "apologized" to Almunia, calling it a "technical problem."  Yet despite the apology, Management did nothing to halt the illicit scheme.

**C.      The Truth Begins to Emerge**

In October 2012, months after Almunia warned Microsoft officials and Management "apologized," Almunia charged Microsoft with failing to abide by the terms of the Settlement. Further, Almunia put Management on notice that Microsoft must include adequate access to rival browsers in European version of the Windows 8 operating system, which was about to go on sale.

On March 6, 2013, it was announced that European regulators had fined Microsoft an extraordinary ***€561 million, or approximately $732.2 million***, for violating the Settlement. Notably, this was the first time in history that the EU had punished a company for neglecting to comply with the terms of an antitrust settlement.  Despite the enormous and unprecedented fine at issue, Management issued an extremely short statement in response to the disastrous situation, again maintaining that the violation of the Settlement was a "technical error."  The statement, contained in a press release, read as follows:

We take full responsibility for the technical error that caused this problem and have apologized for it. We provided the Commission with a complete and candid assessment of the situation, and we have taken steps to strengthen our software

development and other processes to help avoid this mistake – or anything similar – in the future.

## II.   DEMAND PURSUANT TO WASHINGTON LAW

Based on these events, the Stockholder contends that members of Management breached their fiduciary duties of loyalty and good faith by knowingly causing and allowing the Company to violate the terms of the Settlement.  As a direct and proximate result of Management's actions, Microsoft has sustained damages, including (but not limited to) the extraordinary and historic fine of *€561 million ($732.2 million)* imposed by the EU.

Accordingly, pursuant to Washington law, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Washington and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Pursuant to Washington law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

RYAN & MANISKAS, LLP

Katharine M. Ryan

cc: Stephen DiPhilipo

# **<u>EXHIBIT E</u>**

**FENWICK & WEST LLP**

555 CALIFORNIA STREET, 12TH FLOOR   SAN FRANCISCO, CA 94104
TEL: 415.875.2300   FAX: 415.281.1350   WWW.FENWICK.COM

January 28, 2014

SUSAN S. MUCK

EMAIL SMUCK@FENWICK.COM
Direct Dial (415) 875-2325

**VIA E-MAIL AND FEDERAL EXPRESS**

Katherine M. Ryan
Ryan & Maniskas, LLP
995 Old Eagle School Road, Suite 311
Wayne, PA 19087

      Re:    *Shareholder Demand by Stephen DiPhilipo*

Dear Ms. Ryan:

I write in reference to the March 21, 2013 shareholder demand sent to the Board of Directors of Microsoft Corporation on behalf of your client, Stephen DiPhilipo. As you know, Fenwick & West LLP is counsel to the Board committee, consisting of directors Stephen Luczo and Dina Dublon, that was appointed to investigate the allegations in your client's shareholder demand.

The Committee has completed its investigation, and the Committee has presented its recommendation to the Board of Directors. After considering the Committee's recommendation, the Board voted to reject your client's shareholder demand. For your reference, I enclose a copy of the resolution adopted by the Board concerning your client's demand.

Please feel free to contact me if you have any further questions about this matter.

      Sincerely,

      FENWICK & WEST LLP

      Susan S. Muck

Encl.

### RESOLUTION OF THE BOARD OF DIRECTORS
### ADOPTING THE CONCLUSIONS AND RECOMMENDATIONS
### OF THE DEMAND REVIEW COMMITTEE

WHEREAS, the Board of Directors of Microsoft Corporation (the "**Company**") received letters dated March 21, 2013, March 22, 2013, and April 17, 2013 from attorneys purportedly acting on behalf of Stephen DiPhilipo, Kim Barovic, and Randee Bernstein, respectively, purported stockholders of the Company (the "**Demand Letters**"), demanding that the Board of Directors conduct an investigation and thereafter initiate legal action on behalf of the Company against persons who allegedly engaged in the misconduct described in the Demand Letters;

WHEREAS, the issues described in the Demand Letters relate to the Company's failure to comply fully with its obligations under a set of binding commitments that Microsoft gave to the European Commission in December 2009 (the "**Commitments**") to deliver a "Browser Choice Screen" to certain personal computers in the European Economic Area, and to the €561 million fine imposed on the Company by the European Commission in March 2013;

WHEREAS, on May 10, 2013, the Board of Directors appointed a committee of the Board of Directors (the "**Demand Review Committee**"), consisting of independent directors Stephen J. Luczo and Dina Dublon, to review, investigate, and make a recommendation to the Board of Directors as to what actions, if any, are necessary or appropriate and in the best interests of the Company and its stockholders in light of the Demand Letters, in accordance with Washington law, including whether to assert the claims made in the Demand Letters or any other claims concerning related subject matters, and, if so, how;

WHEREAS, the Board of Directors determined that the members of the Demand Review Committee are disinterested directors for purposes of reviewing and investigating the allegations contained in the Demand Letters;

WHEREAS, the Demand Review Committee retained experienced independent counsel from the law firm of Fenwick & West LLP to assist the Committee in investigating the allegations contained in the Demand Letters;

WHEREAS, the Demand Review Committee investigated the allegations contained in the Demand Letters, and, specifically, the Demand Review Committee:

i.    Reviewed and analyzed the European Commission's March 2013 Decision and Findings;

ii.   Reviewed and analyzed the September 4, 2012 Report of Dechert LLP on Microsoft's Failure to Deliver the Browser Choice Screen to Windows 7 Service Pack 1 Personal Computers in Europe (the "**Dechert Report**");

iii.  Reviewed and analyzed the key documents identified by Dechert and relied on in the Dechert Report;

iv.   Reviewed over 10,000 additional documents;

v.    Conducted relevant witness interviews;

vi.     Analyzed the Company's internal controls and reporting structure relating to antitrust compliance, both before and after July 2012;

vii.    Researched and analyzed the standards of conduct for, and legal standards for imposing liability on, corporate officers and directors under Washington law;

viii.   Reviewed and analyzed relevant corporate and governance documents, including the Company's Articles of Incorporation, Bylaws, Corporate Governance Guidelines, Standards of Business Conduct, minutes from meetings of the Company's Board of Directors, Antitrust Compliance Committee, and Regulatory and Public Policy Committee, and relevant press releases and SEC filings;

ix.     Considered the Company's indemnification obligations to current and former officers and directors, as well as the Company's self-insured status; and

x.      Invited counsel for Stephen DiPhilipo, Kim Barovic, and Randee Bernstein to meet with counsel for the Demand Review Committee and to provide any information they believed that the Demand Review Committee should consider;

WHEREAS, the Demand Review Committee documented its conclusions and recommendations and presented its conclusions and recommendations to the Board of Directors;

WHEREAS, the Demand Review Committee, after careful deliberation and consideration of all of the information available to it, and in the good faith exercise of its business judgment and having considered the best interests of the Company and its stockholders, has concluded that it is not in the Company's best interests to pursue any claims based on the allegations contained in the Demand Letters because, among other reasons, the relevant facts do not support any viable claim for breach of fiduciary duty, the Company would not succeed in recovering damages from any of the individuals named in the Demand Letters or from any other individuals, the Company would not receive any meaningful non-monetary benefits as a result of pursing claims based on the allegations contained in the Demand Letters, the Company undertook and adopted significant remedial measures before it received any of the Demand Letters, and pursuing litigation based on the Demand Letters would result in substantial expense to the Company; and

WHEREAS, the Demand Review Committee has therefore recommended that the Board of Directors vote to reject the Demand Letters;

NOW, THEREFORE, in view of the foregoing, and after careful deliberation and discussion of all the information made available to the Board of Directors regarding the matters raised by the Demand Letters, and in the good faith exercise of its business judgment, the following resolution is adopted by the Board of Directors:

RESOLVED, that the investigation undertaken by the Demand Review Committee was reasonable, thorough, and undertaken in good faith with the assistance of experienced independent counsel, and that the inquiry was sufficient to allow members of the Board of Directors to reasonably rely on the Demand Review Committee's findings and conclusions in determining what response to the Demand Letters is in the best interests of the Company;

FURTHER RESOLVED, that based on the Demand Review Committee's thorough investigation and review of the applicable facts and law and the Demand Review Committee's recommendations to the Board of Directors, the Board of Directors concludes that the allegations contained in the Demand Letters do not give rise to legally viable claims against any of the Company's current or former officers or directors, that the Company would not succeed in recovering damages from any of the individuals named in the Demand Letters or from any other individuals, that the Company would not receive any meaningful non-monetary benefits as a result of pursuing claims based on the allegations contained in the Demand Letters, that the Company undertook and adopted significant remedial measures before it received any of the Demand Letters, and that pursuing litigation based on the Demand Letters would result in substantial expense to the Company; and

FURTHER RESOLVED, that the Board of Directors rejects the Demand Letters, declines to take any of the actions requested by the Demand Letters, and declines to permit any of Stephen DiPhilipo, Kim Barovic, or Randee Bernstein to initiate or pursue any litigation on the Company's behalf relating to any of the allegations contained in the Demand Letters or to any other matter.